## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Joyce Toth<br><br>Plaintiff<br><br>v.<br><br>Everly Well, Inc. and Everly Health, Inc.,<br><br>Defendants | Case No. 1:23-cv-11043 |

## CLASS ACTION COMPLAINT

Plaintiff Joyce Toth ("Plaintiff"), individually and on behalf of all others similarly situated, hereby brings this Class Action Complaint against Defendants Everly Well, Inc. and Everly Health, Inc. (collectively referred to herein as "Defendants") and, in support thereof, alleges as follows:

## INTRODUCTION

1.      Using deceptive and unfair sales tactics, Defendants manufacture and sell what they falsely and misleadingly label and market as a medically beneficial "Food Sensitivity" test (referred to herein as the "Test Kit," or simply "Test"). Consumers across the country pay a hefty price for this Test in two ways: (1) paying over a hundred dollars per Test and (2) providing valuable personal information, including medical information from blood samples ("Private Consumer Data"). But contrary to how Defendants package and market the Test, it has no value whatsoever as the Test cannot actually identify food sensitivities. Meanwhile, Defendants retain the right to use and sell the Private Consumer Data, including whatever information they extract

1

from the blood samples provided. Ultimately, Defendants are selling expensive snake oil and earning massive profits from the sale, while also acquiring for no cost valuable Private Consumer Data, which they claim to have a right to use for their own purposes and profit.

2.    Although "food sensitivity" is not an official medical diagnosis, consumers understand the phrase to mean a chronic, adverse reaction to a food, such as gastrointestinal distress, rashes, migraines, inflammation, or a worsening of another underlying condition. Defendants know this, and market the test as a "Food Sensitivity Test," that can determine "reactivity" to certain foods. This is false and misleading, as the Test sold by Defendants does not actually determine if any given food is the actual or likely cause of any adverse reactions. Rather, the Test merely measures the level of immunoglobulin G antibodies ("IgG") in the blood, which at most only tells a consumer if they ate a food recently.

3.    The scientific medical community, including the American Academy of Allergy, Asthma, and Immunology, as well as the European Academy of Allergy and Clinical Immunology, and the Canadian Society of Allergy and Clinical Immunology, all agree that the type of IgG testing that Defendants offer should not be used by consumers to identify or predict adverse reactions or sensitivities to food. For example, the American Academy has stated that "[t]he presence of IgG is likely a normal response of the immune system to exposure to food. In fact, higher levels of IgG4 [one of the IgG subclasses] to foods may simply be associated with tolerance to those foods." Likewise, the Canadian Society of Allergy and Clinical Immunology has stated it is "very concerned" about the increased marketing of IgG tests for food sensitivities, noting that "positive test results for food-specific IgG are to be expected in normal, healthy adults and children."

4.      Nevertheless, Defendants use false and misleading marketing to deceive consumers into purchasing their Test Kits. Defendants advertise to consumers that they can use their "physician-approved," "CLIA-certified" Tests to determine their Immunoglobulin G (IgG) Antibody Reactivity to different foods. These claims are designed to mislead consumers into purchasing a Test Kit and provide Private Consumer Data under the mistaken belief that the Test can provide helpful information when in fact the Test is not medically approved, cannot identify adverse food sensitivities, has no health benefit or diagnostic value, and can even be detrimental to consumers' health. No reasonable consumer would pay money for a "food sensitivity" kit that is ineffective in predicting adverse food sensitivities, the very thing for which the Test Kits are named. The Test Kits thus do not provide anything of value to a reasonable consumer and are worthless.

5.      What's more, not only do Defendants charge a high price tag for their worthless Tests, they also use the Tests to covertly collect and use consumers' personal information, including Private Consumer Data, without paying consumers for this privilege. Defendants do not adequately disclose to consumers that Defendants will require them to agree to additional terms and conditions after the point of sale via a registration process in order to receive the actual advertised benefit, *i.e.*, the test results. Likewise, nowhere on the packaging or advertisements do Defendants tell consumers that they intend to collect their Private Consumer Data for their personal use; that information is only disclosed in fine print buried on Everlywell's website.

6.      No reasonable consumer would turn over medical information and other personally identifiable and private information to a for-profit company that purported to have a right to use that information for other, unrelated, and undisclosed commercial purposes and/or sell the information to third parties, when that company was not providing any actual medical

3

service or information, nor any consideration or renumeration.

7.    In other words, Defendants not only receive significant monetary sums from consumers duped into paying for their Test Kits based on Defendants' false and misleading representations, including the fact that they omit material information about the Test Kits' inability to diagnose food sensitivities, but Defendants also use deceptive and unfair tactics to collect consumers' private personal information for Defendants' own use and profit.

8.    Accordingly, Plaintiff brings this consumer class action individually and on behalf of a class of similarly situated consumers (defined below) to redress the false and misleading, as well as deceptive and unfair trade practices, acts, and omissions employed by Defendants in the marketing and sale of their Everlywell Food Sensitivity Test Kits.

## PARTIES

9.    Plaintiff Joyce Toth is a Massachusetts citizen who, at all times material hereto, was a resident of Essex County, Massachusetts. As discussed in more detail in Paragraphs 83-88, in or around July 2022, while at her home in Massachusetts, Plaintiff purchased the 96-food version of the Everlywell Food Sensitivity Test Kit from Target's website for approximately $119.99, based on Defendants' representations and omissions about the Test Kit, including that it was able to do the very thing for which it was named, *i.e.*, identify food sensitivities, via a medically-accepted method for doing so, as claimed on the Test Kit's packaging. Plaintiff was thus misled into taking the Test and providing valuable Private Consumer Data to Defendants in the process. Plaintiff would not have purchased the Test, or alternatively would not have paid a premium for it, had Defendants not made the misrepresentations and omissions set forth herein. Nor would Plaintiff had submitted her Private Consumer Data, or alternatively would have only submitted it under limited, restricted conditions.

10.    Defendants Everly Well, Inc. ("EWI") and Everly Health, Inc. ("EHI") (collectively "Defendants") are both corporations organized under the laws of the State of Delaware. EWI and EHI share the same principal place of business, located at 823 Congress Avenue, Suite 1200 in Austin, Texas, and they have the same registered agent.

11.    Defendants are in the business of developing, marketing, distributing, and selling products that purport to be for the purpose of providing health diagnostics to consumers, typically under the "Everlywell" brand name. EWI was formed in 2015, and initially had primary responsibility for the development, marketing, and sale of the Everlywell Test Kits.

12.    In the period leading up to March 2021, EHI was formed, and some restructuring was undertaken to ensure that EWI's assets were under the control of EHI. Additional companies were acquired, including PWN Health (now branded as Everly Health Solutions, which provides services and diagnostic tools to insurers, employer sponsored health care plans, and others in the industry), and Home Access Health Corporation (which markets and sells self-collected health tests for various sexually transmitted diseases). Shortly thereafter, EHI acquired Natalist, which sells fertility and pregnancy-related products and tests.

13.    The precise nature of the arrangements between Defendants and other companies in their portfolio is in the exclusive control of Defendants. That said, from the information publicly available and known to Plaintiff, it appears that EWI transferred some or all of the assets, liabilities, and control for the Test Kits to EHI such that Defendants share responsibility for the marketing and sale of the Test Kits. Julia Cheek founded both EWI and EHI and has at all times relevant to this matter served as the CEO of both Defendants. However, it is unclear whether EWI has any paid employees. Although several executives and personnel identify themselves on LinkedIn as working for "Everlywell," the logo appearing next to their employer is for "Everly

Health." EWI does not appear to maintain an independent LinkedIn page, and on EHI's LinkedIn page, EHI holds itself out as a unified entity with EWI, stating:

> Everlywell, PWNHealth, and Home Access Health Corp. are now Everly Health. We've formed Everly Health to improve the lives of millions with a fully integrated digital care platform for consumers and businesses. We continue to innovate in the space by delivering more care to more people on a seamless diagnostics-driven platform. We believe better healthcare is achieved when everyone has access to fully integrated digital care. That a person's life can transform if we meet people where they are and provide them with a pathway to affordable and actionable health insights. The way healthcare should be—centered around people.[1]

14.     On the other hand, both EWI and EHI's websites refer consumers to Twitter and Instagram accounts for EWI only; EHI does not appear to maintain a social media presence on those channels.

15.     EHI claims that it provides access to "better healthcare" through "modern, diagnostics-driven care" and with EHI, markets products under the "Everlywell" brand for the purpose of providing digital healthcare that develops a "healthier tomorrow" for consumers through "personalized results and accessible tools for long-term health." Defendants sell a variety of at-home healthcare tests and have become market leaders in this space, with rapidly increasing sales.[2] In addition to their Food Sensitivity Test Kit, which has been one of Defendants' best-selling tests, Defendants sell women's and men's health tests, sleep & stress tests, metabolism tests, heavy metal tests, and inflammation tests, among many others. Using false and misleading sales tactics, Defendants manufacture, market, advertise, and sell their Food Sensitivity Test Kits in Massachusetts and throughout the United States,[3] including at major retailers such as Target

---

[1] https://www.linkedin.com/company/everlyhealth/ (last accessed May 10, 2023).

[2] ABC News, *Lori Greiner Hits the Billion Dollar Mark* (Mar. 14, 2020), *available at* https://www.youtube.com/watch?v=xf0jkFBMeNQ (last accessed May 10, 2023).

[3] Defendants claim to not sell the tests in New York, where the tests do not comply with New York law.

and CVS.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because there are 100 or more class members; at least one class member is a citizen of a state that is diverse from Defendants' citizenship; and the matter in controversy exceeds $5 million, exclusive of interest and costs.

17.     This Court has personal jurisdiction over Defendants because Defendants operate, conduct, and engage in substantial business in this judicial district, including but not limited to the promotion, sale, marketing and distribution of their Food Sensitivity Test Kits; Defendants committed tortious acts in this State through their misrepresentations related to the sale, marketing, and distribution of the Kit in this State; Defendants caused injury to persons within this State; and a substantial portion of the actions giving rise to the claims took place in this State.

18.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## FACTUAL ALLEGATIONS

### A.     Overview of Defendants' Test Kits

19.     Defendants' Food Sensitivity Test Kit purports to test Immunoglobulin G ("IgG") for antibody reactivity to a variety of foods. But contrary to Defendants' claims, over-the-counter IgG testing does not detect adverse sensitivities to specific foods as Defendants claim. Rather, at-home testing for IgG food levels only shows whether the body has been exposed to or digested certain foods. The results have no utility whatsoever in predicting adverse food sensitivities.[4]

---

[4] Krisberg, Kim, *Is Everlywell for Real?*, Austin Monthly (Feb. 2021).

20.    IgG is the most common type of antibody found in a person's blood and helps to prevent infections. The production of IgG is thus a normal healthy response of the immune system to exposure to food, with IgG antibodies to foods found in virtually all healthy individuals.[5] In contrast to Immunoglobulin E ("IgE"), an antibody that produces an allergic response, measuring IgG shows what people have eaten in the past, with higher levels tied to foods that are consumed more than others. Higher IgG levels do not mean an individual is intolerant or sensitive to a particular food.

21.    Rather, the presence of IgG antibodies is considered an immunological <u>tolerance</u> to those foods, not intolerance. In other words, higher IgG levels may correspond to a *lower* adverse sensitivity to a particular food instead of a greater adverse sensitivity, as Defendants falsely and misleadingly claim. In short, IgG testing is entirely "irrelevant for the laboratory work-up of food allergy or intolerance and should not be performed in case of food-related complaints."[6]

22.    That is because elevated IgG can just as easily indicate that a food has been regularly consumed within the several months before the test or that eating more of a particular food has caused the immune system to develop a greater tolerance to it (and thus produces higher IgG levels). Accordingly, Defendants' Food Sensitivity Test Kits, through reporting of

---

[5] Kelso, John M., *Unproven Diagnostic Tests for Adverse Reactions to Food*, J. Allergy & Clinical Immunology (Vol. 6 Issue 2 March 1, 2018), *available at* https://www.jaci-inpractice.org/article/S2213-2198%2817%2930704-3/fulltext#sec2 (last accessed May 10, 2023).

[6] Stapel et al., *Testing for IgG4 against foods is not recommended as a diagnostic tool: EAACI Task Force Report*, Eur. J. Allergy & Clinical Immunology (Vol. 63, Issue 7, p. 793-96, June 28, 2008), *available at* https://pubmed.ncbi.nlm.nih.gov/18489614/; *Position Statement: AAAI Support of the EAACI Position Paper on IgG4* (May 2010), *available at* https://www.aaaai.org/aaaai/media/medialibrary/pdf%20documents/practice%20and%20parameters/eacci-igg4-2010.pdf.

heightened IgG levels, are prone to falsely indicate an individual may have an adverse food sensitivity when in fact they do not and the test cannot even determine that. Such a scenario could furthermore prove dangerous if a consumer eliminates healthy foods from his or her diet or is distracted from pursuing the real cause of their symptoms.

23.     On the flip side, an individual may be adversely sensitive (or even allergic) to certain foods, but have no heightened IgG level simply because the food has not been regularly consumed prior to the blood sample being taken. In such a scenario, by reporting no heightened IgG levels, Defendants' Food Sensitivity Test Kits would falsely indicate that an individual has no food sensitivity when in fact they do and may actually need immediate medical attention. The Canadian Society of Allergy and Clinical Immunology (CSACI) has identified this as a significant concern because "a person with a true immunoglobulin E (IgE)-mediated food allergy, who is at significant risk for life-threatening anaphylaxis, may very well not have elevated levels of specific IgG to their particular allergen, and may be inappropriately advised to reintroduce this potentially deadly item into their diet."[7]

24.     IgG testing for food sensitivities has thus been the subject of significant scientific criticism over the years and has been overwhelmingly rejected by the medical community for more than a decade. Yet, because it is considered a laboratory-developed test, Defendants' Food Sensitivity Test Kit is not regulated by the Food and Drug Administration. And because there is broad consumer demand, companies like Defendants have an incentive to keep making and marketing the test as beneficial to consumers' health when it is not.

---

[7] Carr et al., *CSACI Position Statement on the Testing of Food-Specific IgG*, Allergy, Asthma & Clinical Immunology (2012), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3443017/ (last accessed May 10, 2023) (emphasis added).

B.    **The Worldwide Scientific Medical Community Has Universally Rejected Tests like Defendants' Food Sensitivity Test Kits**

25.    The scientific medical community has increasingly been sounding the alarm on a potentially harmful fad driven by the aggressive marketing of test kits by companies like Defendants, who market "food sensitivity" tests to consumers as a test to medically assess and improve their health notwithstanding that the medical scientific community overwhelmingly recommends against using these tests.

26.    Medical professionals from around the globe have for years roundly rejected using tests like Defendants' Food Sensitivity Test Kit to determine adverse food sensitivities, characterizing the tests as myths, gimmicks, and pseudoscience. Findings and guidelines against utilizing these tests have been issued by organizations such as the American Academy of Allergy, Asthma and Immunology, European Academy of Allergy and Clinical Immunology, CSACI, Australian Society of Clinical Immunology and Allergy, Allergy Society of South Africa, and Food Allergy Research & Education.

27.    These associations of medical professionals and allergy and immunology experts agree that over-the-counter IgG tests such as Defendants' Test cannot identify for consumers any food sensitivities. They additionally have warned that there is no scientific proof for the claim that the type of IgG testing sold by Defendants in the Test Kits can identify food sensitivities; rather, the scientific evidence shows that IgG tests often measure normal immune, healthy responses to the recent consumption of food, and not an immune response that can be used to predict a sensitivity or allergy.

28.    Thus, not only are the claims made by Defendants false, they are misleading in that Defendants fail to disclose that the tests are unreliable predictors of reaction to food. These experts further agree that the IgG testing offered by Defendants present serious risk of harm to

consumers due to the misinformation, confusion, and risk of increased health care costs or misdiagnosis stemming from Defendants' promotion of IgG tests for the purpose of identifying food sensitivities, which can lead to needless, harmful interventions.

29.     For example, the American Academy of Allergy, Asthma and Immunology (AAAAI), which is a leading membership organization of allergists/immunologists, with more than 7,000 members in the United States, Canada, and 72 other countries, has repeatedly criticized tests like Defendants' Food Sensitivity Kits. As far back as May 2010, the AAAAI issued a Position Statement stating, "the detection of food-specific antibody in patient sera does not necessarily indicate food allergy or intolerance, but rather a physiologic response of the immune system to exposure to food. For IgG and more specifically IgG4, *this may be the normal human response*."[8] Thus, according to AAAAI, over the counter IgG tests like those offered by Defendants are a "myth" and can actually be harmful to consumers, given the risk that the results "may be misinterpreted leading to diets that may be nutritionally inadequate and are certainly not easy for patients to follow."[9] This is especially true given Defendants' failure to inform consumers of their Tests' limitations.

30.     The AAAAI website has also featured an article for numerous years titled *The Myth of IGG Food Panel Testing*, in which AAAAI states:

> A test that claims to be able to diagnose food sensitivities and is commonly available is the food IgG test. This test, offered by various companies, reports IgG levels to multiple foods (usually 90 to 100 foods with a single panel test) claiming that removal of foods with high IgG levels can lead to improvement in multiple symptoms. Some websites even report that diets utilizing this test can help with symptoms of irritable bowel syndrome, autism, cystic fibrosis, rheumatoid arthritis and epilepsy.

---

[8] *Position Statement: AAAAI Support of the EAACI Paper on IgG4*, *available at* https://www.aaaai.org/aaaai/media/medialibrary/pdf%20documents/practice%20and%20parameters/eacci-igg4-2010.pdf (last accessed May 10, 2023) (emphasis added).

[9] *Id*.

It is important to understand that this test has never been scientifically proven to be able to accomplish what it reports to do. The scientific studies that are provided to support the use of this test are often out of date, in non-reputable journals and many have not even used the IgG test in question. The presence of IgG is likely a normal response of the immune system to exposure to food. In fact, higher levels of IgG4 to foods may simply be associated with tolerance to those foods.[10]

31.    The CSACI likewise issued a similar Position Statement to the one the American Academy of Allergy, Asthma and Immunology issued in May 2010. In this Position Statement, the CSACI made clear that the use of tests like Defendants' Food Sensitivity Test Kits could have harmful consequences to consumers' health in that they increase the likelihood that consumers will introduce unnecessary dietary restrictions that could be harmful to their health or introduce foods back into their diet that could be potentially deadly. But in no event were they medically useful for consumers' health, despite Defendants' false claims to the contrary. Specifically, the CSACI stated:

> [CSACI] is very concerned about the increased marketing of food-specific immunoglobulin G (IgG) testing towards the general public over the past few years, supposedly as a simple means by which to identify "food sensitivity," food intolerance or food allergies.
> …
> There is no body of research that supports the use of this test to diagnose adverse reactions to food or to predict future adverse reactions. The literature currently suggests that the presence of specific IgG to food is a *marker of exposure and tolerance to food*, as seen in those participating in oral immunotherapy studies. Hence, positive test results for food-specific IgG are to be expected in normal, healthy adults and children. Furthermore, the inappropriate use of this test only increases the likelihood of false diagnoses being made, resulting in unnecessary dietary restrictions and decreased quality of life.
> …
> Additionally, and perhaps of greater potential concern, a person with a true immunoglobulin E (IgE)-mediated food allergy, who is at significant risk for life-threatening anaphylaxis, may very well not have elevated levels of specific IgG to their particular allergen, and may be inappropriately advised to reintroduce this potentially deadly item into their diet.[11]

---

[10] AAAAI, *The Myth of IGG Food Panel Testing*, available at https://www.aaaai.org/tools-for-the-public/conditions-library/allergies/igg-food-test (last accessed May 10, 2023).

[11] Carr et al., *CSACI Position Statement on the Testing of Food-Specific IgG*, Allergy, Asthma & Clinical Immunology (2012), *available at*

32.     The European Academy of Allergy and Clinical Immunology (EAACI), endorsed by AAAAI, has also been clear that "food-specific IgG4 [one of the IgG subclasses] does not indicate (imminent) food allergy or intolerance, but rather a physiological response of the immune system after exposition to food components. Therefore, testing of IgG4 to foods is considered as irrelevant for the laboratory work-up of food allergy or intolerance and should not be performed in case of food related complaints."[12]

33.     The Australian Society of Clinical Immunology and Allergy (ASCIA) has advised:

> IgG antibodies are proteins produced by the immune system in response to exposure to external triggers, like pollens, foods or insect venoms. Their presence _reflects exposure to these triggers, not disease that results from exposure_. IgG antibodies to food are commonly detectable in healthy adult patients and children, whether food-related symptoms are present or not. There is no credible evidence that measuring IgG antibodies is useful for diagnosing food allergy or intolerance, nor that IgG antibodies cause symptoms. (The only exception is that gliadin IgG antibodies can be used to monitor the success of avoiding gluten in people with proven celiac disease.). Despite studies showing the uselessness of this technique, it continues to be promoted in the community.[13]

34.     Food Allergy Research & Education (FARE) is a non-profit organization that works on education and advocacy initiatives around food allergy awareness and treatment. FARE explains that "IgG are the normal antibodies made by the body to fight off infections. The creation

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3443017/ (last accessed May 10, 2023) (emphasis added).

[12] Stapel et al., _Testing for IgG4 against foods is not recommended as a diagnostic tool: EAACI Task Force Report_, Eur. J. Allergy & Clinical Immunology (Vol. 63, Issue 7, p. 793-96, June 28, 2008), _available at_ https://pubmed.ncbi.nlm.nih.gov/18489614/; _Position Statement: AAAI Support of the EAACI Position Paper on IgG4_ (May 2010), _available at_ https://www.aaaai.org/aaaai/media/medialibrary/pdf%20documents/practice%20and%20parameters/eacci-igg4-2010.pdf.

[13] ASCIA, _Unorthodox Testing and Treatment for Allergic Disorders_, _available at_ https://www.allergy.org.au/images/stories/aer/infobulletins/2010pdf/AER_Unorthodox_Testing_Treatment_for_Allergic_Disorders.pdf (last accessed May 10, 2023) (emphasis added).

of IgG antibodies is thought to be a normal response to eating food."[14]

35.    Likewise, the Allergy Society of South Africa (ALLSA) has issued a Position Statement, explaining that "there is no evidence to suggest that [IgG Testing] has a diagnostic value in predicting food allergens or other substances that may be affecting individuals."[15] Rather, "strong IgG responses have been demonstrated to be a *normal physiological response* to certain proteins that are frequently ingested under normal circumstances, and are commonly detectable in healthy adult patients and children, independent of the presence or absence of food-related symptoms."[16]

36.    The Hong Kong Institute of Allergy has also reiterated that "[t]he measurement of food-specific IgG concentrations is of no clinical relevance."[17]

37.    Accordingly, there is no actual scientific debate as to whether Defendants' Food Sensitivity Test Kits provide any health benefit—they do not. What's more, these Tests are harmful to consumers' health and wallets. As the result of the false and misleading marketing surrounding these tests, dieticians and nutritionists are reporting a surge in patient self-reporting of "new" adverse food sensitivities. Consumers are thus seeking treatment for phony diagnoses and misinformation, expending their time, sick leave, and money trying to treat what the Tests lead them to believe is a sensitivity or allergy.

38.    Similarly, consumers relying on Defendants' claims that the Tests can treat food

---

[14] FARE, *Unproven Diagnostic Tests*, *available at* https://www.foodallergy.org/resources/unproven-diagnostic-tests (last accessed May 10, 2023).

[15] ALLSA, *Position Statement: ALCAT and IgG Allergy & Intolerance Tests*, *available at* https://allsa.org/wp-content/uploads/2018/03/Intolerance-tests.pdf (last accessed May 10, 2023).

[16] *Id*. (emphasis added).

[17] Lee, TH et al., *Commentary: Immunoglobulin G testing in the diagnosis of food allergy and intolerance*, Hong Kong Med. J., Vol. 23, No. 4 (Aug. 2018), *available at* https://www.hkmj.org/system/files/hkmj176310.pdf

sensitivities, as well as their failure to disclose that the Tests only measure a normal, healthy immune response, may begin costly and disruptive diets to avoid certain foods for which they have no medical need to avoid. Consumers may also avoid seeking treatment for the real culprit of any underlying symptoms on the mistaken belief that a food sensitivity is to blame, jeopardizing their long-term health.

39.    Medical professionals are concerned with IgG testing being used for children in particular. As the CSACI noted, the administration of these tests to children "may lead to exclusion diets that carry risks of poor growth and malnutrition; for example, the elimination of dairy products, wheat, eggs, and/or other foods found in healthy balanced diets."[18] Furthermore, "unnecessary avoidance of foods in early life may promote the loss of tolerance and facilitate onset of allergic disease."[19] And a recent commentary from medical professionals in China highlighted the serious adverse reactions and possible deaths that could occur if parents rely on false negatives produced by these tests to reintroduce foods that could lead to severe anaphylaxis in children.[20]

40.    In short, the scientific medical community in the United States and around the world agrees that IgG tests like Defendants' Food Sensitivity Test Kits are both ineffective and ultimately counterproductive to overall health. Indeed, in addition to the overwhelming rejection of IgG testing in the medical scientific community, Defendants' Test Kits in particular have been

---

[18] CSACI, *CSACI Position Statement on the Testing of Food-Specific IgG*, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3443017/ (last accessed May 10, 2023) (emphasis added).

[19] Lee, TH et al., *Commentary: Immunoglobulin G testing in the diagnosis of food allergy and intolerance*, Hong Kong Med. J., Vol. 23, No. 4 (Aug. 2018), *available at* https://www.hkmj.org/system/files/hkmj176310.pdf.

[20] *Id.*

the subject of criticism and scrutiny.[21]

41.    The research is clear and has consistently shown that the production of food-specific IgG is the body's natural response to a regularly ingested food. Thus, antibodies are not evidence of a disease or adverse food sensitivity, meaning Defendants' Tests are unable to identify food sensitivities and provide no useful health information. As Robert Hamilton, a professor of medicine at John Hopkins University, succinctly put it: these IgG antibody tests are "essentially a bogus test," explaining "[t]his type of test is basically totally inappropriate."[22]

## C.    Defendants Falsely and Misleadingly Market their Food Sensitivity Test Kits

42.    Defendants are well aware that IgG testing is worthless as their Food Sensitivity Test Kits deliver no health or educational benefit whatsoever and are even dangerous in that they may suggest adverse food sensitivities resulting in unhealthy diet modification, or fail to identify real food allergies or other health problems. Defendants have even publicly recognized that the AAAAI recommends against using their Test Kit, but Defendants remain undeterred.[23]

43.    Notwithstanding the overwhelming rejection of IgG food sensitivity testing in the

---

[21] *See, e.g.*, Lesley McClurg, *Do DIY Medical Tests Promise More Than They Can Deliver?*, National Public Radio, May 28, 2018, *available at* https://www.npr.org/sections/health-shots/2018/05/28/614125270/do-diy-medical-tests-promise-more-than-they-can-deliver (last accessed May 10, 2023); *see also* Shayla Love, *Food Intolerance Tests Are Shoddy Science and Traps for Disordered Eating*, VICE Magazine, Feb. 23, 2018, *available at* https://www.vice.com/en/article/43778n/food-intolerance-tests-are-shoddy-science-and-traps-for-disordered-eating (last accessed May 10, 2023); Allison Bond, *A 'Shark Tank'-funded test for food sensitivity is medically* dubious*, experts say*, STAT Magazine, Jan. 23, 2018, *available at* https://www.statnews.com/2018/01/23/everlywell-food-sensitivity-test/ (last accessed May 10, 2023 Harriet Hall, *Everlywell: At-Home Lab Tests That Don't Make Sense*, Society for Science-Based Medicine, June 4, 2019, *available at* https://sciencebasedmedicine.org/Everlywell-at-home-lab-tests-that-dont-make-sense/ (last accessed May 10, 2023).

[22] Shayla Love, *Food Intolerance Tests Are Shoddy Science and Traps for Disordered Eating*, VICE Magazine, Feb. 23, 2018, *available at* https://www.vice.com/en/article/43778n/food-intolerance-tests-are-shoddy-science-and-traps-for-disordered-eating (last accessed May 10, 2023).

[23] *Id.*

scientific medical community, Defendants have marketed the Tests as being capable of identifying food sensitivities, and they charge consumers top dollar for it. Everlywell's product sales have exploded due to their false and misleading marketing of the Tests since their introduction.

44.     In 2017, Defendants' CEO, Julia Cheek, appeared on the television program *Shark Tank*, at which time Defendants had approximately $2.5 million in sales. By February 2020, Ms. Cheek said in an interview that the business was making approximately $60 million in sales annually, with the Test Kits regularly stocked at Target, CVS, and Walgreens. Months later, Everly Well, Inc. announced that it had received $175 million in new financing from venture capital firms, followed by an additional $75 million to support the $1.3 billion valuation of the company. The company further benefited from the pandemic-induced telehealth explosion.

45.     Defendants sell two versions of their home IgG Test: (1) the original "Food Sensitivity Test," which is advertised as being able to test for sensitivities to 96 different foods; and (2) a more expensive "Food Sensitivity Comprehensive Test," which is advertised as being able to test for sensitivities to 206 different foods. Other than the number of foods tested, the original version and the "comprehensive" version both rely on the same IgG testing methodology, and thus, the claim that each is a food sensitivity test is based on the same misrepresentation of the underlying science.

46.     Throughout the class period, through the Everlywell brand name, label, and packaging and other advertising, Defendants falsely and deceptively present their Food Sensitivity Test Kit as a medical test with a corresponding medical, health, and educational benefit that will promote a consumer's health and wellbeing, when in reality, the Test has no value whatsoever and can even be harmful to health by indicating a consumer should cut back on

foods that are perfectly healthy to consume (a "false positive" result) or by indicating that a consumer has no sensitivity to a food they may actually be allergic to (a "false negative" result).

### i. Defendants have consistently used false representations and omitted material information on the tests' packaging.

47.     On every version of the Test sold to class members, Defendants have represented on the outside packaging that the Test Kits are "Food Sensitivity Tests" that provide medically accepted health information regarding a person's "sensitivity" or "reactivity" to certain foods without disclosing that the Tests are not suitable for this purpose and do not have acceptance in the medical community.

48.     In furtherance of Defendants' claim that the Test is a medical test with medical benefits that contributes to a consumer's overall health and wellbeing, the Test's front label includes Defendants' wellness brand name, Everlywell, and falsely represents that it has medical acceptance in the scientific community (when it does not) through its misleading representation that it is a "Physician-approved lab test" that uses "CLIA-Certified Lab Partners."

49.     By labeling the Test as a "Food Sensitivity" test, moreover, Defendants falsely represent and lead reasonable consumers to purchase the Test believing that there is a health reason to test for "food sensitivity" (when there is none), that the Test can actually identify food sensitivities that can impact a person's health (when it cannot because it only measures the presence of antibodies and thus, at most, merely identifies a normal biological reaction to food that provides no helpful information), and that if the Test does not identify a food sensitivity, the consumer will not have an adverse reaction to that food (when that is untrue).

50.     Nowhere on the package do Defendants disclose that the Test may only measure a normal biological reaction or otherwise suggest to a consumer that the Tests are unreliable and unproven at identifying food allergies and insensitivities.

51.     During the Class Period, Defendants have consistently marketed the product as a food sensitivity test, and have omitted material facts about the product, including that (1) the test is not capable of identifying food insensitivities or other chronic adverse reactions; (2) the test only informs the consumer about whether they have consumed a food recently and does not otherwise provide any sort of health information or benefit; and (3) as discussed in more detail in Paragraphs 64-82, Defendants intend to retain and use Private Health Data.

52.     Defendants have consistently sold the Test Kits in simple packaging. All are sold in sealed boxes that simply identifies the product as a "Food Sensitivity Kit," with minimal additional information. While Defendants initially used a purple color scheme, at some point in 2022, they redesigned their logo and overall look, introducing a green color scheme and new packaging for their products, including the Food Sensitivity Test. In terms of the core false claims, misrepresentations, and omissions regarding the use and benefits of the Test, the old and new packaging are materially the same. Both claim to be physician approved food sensitivity tests, and omit the three material facts identified in Paragraph 51.

53.     Below are exemplars of the Test Kit's front label, which is presented to consumers at the time of sale:







54.    The Test Kit's back label reiterates that the product is a food sensitivity test, and throughout the Class Period, on both the purple and green packaging, informs consumers that the product is suitable to test 96 (or over 200) foods for Immunoglobulin G (IgG) antibody reactivity. The back label then identifies certain foods that the Kit purportedly tests "reactivity" for. Because

Defendants identify the product as a Food Sensitivity Test, consumers who read the additional information on the back of the package understand "reactivity" to mean that the product tests for chronic adverse or abnormal reactions to the foods on the list, *i.e.*, sensitivities. Nowhere on the back of the package do Defendants disclose the three material facts identified in Paragraph 51. At most, Defendants only state in very fine print at the back of the package that the product serves an educational purpose and not a diagnostic one, but the information does not have any educational value and certainly not with respect to identifying food sensitivities, given that it merely informs consumers of the foods they have eaten, which they already have knowledge of, and even then, IgG testing does not reliably identify if you have in fact eaten a given food and in fact is not intended for that purpose.

54. Defendants' description of the product as a "Food Sensitivity Test" (or "reactivity" test), and their omissions in Paragraph 51, including those regarding the limitations and suitability of IgG testing for that purpose, lead reasonable consumers to purchase the Test with the belief that it will identify a chronic adverse reaction for various food items if one exists, which is false. It also leads reasonable consumers to purchase the Test with the belief that if foods on the list are *not* flagged, the consumers are free to eat those foods without risk of an adverse reaction.

  **ii.  Defendants' other advertising for the tests contains the same false representations and material omissions as the packaging.**

56. Defendants' false representations and omissions are repeated elsewhere in Defendants' advertising. Defendants have run a long-term campaign that has consistently advertised the Test as a food sensitivity test while omitting the material information in Paragraph 51. Defendants' consistent campaign leads consumers to believe Everlywell is a trusted health company and that its food sensitivity tests are reliable.

57.    First, throughout the class period, Defendants' website www.everlywell.com, repeated the aforementioned misrepresentations and omissions. Defendants consistently advertise that the product is a Food Sensitivity Test Kit without disclosing the material facts identified in Paragraph 51. Although Defendants mention that they intend to retain and use Private Health Data in fine print buried on their website, Defendants have never displayed that information in advertising, in the general descriptions of the Tests, or other locations likely to be viewed and consulted by consumers.

58.    Second, throughout the class period, Defendants have maintained various social media accounts through which they promote the Tests. In particular, on its Everlywell Facebook, Twitter, and Instagram pages, Defendants regularly create public posts that advertise and promote the Tests as "food sensitivity tests," consistently omitting the material facts discussed in Paragraph 51. Defendants' advertising is viewed by their tens of thousands of followers, as well as interested consumers who seek out more information from Defendants.

59.    Third, throughout the class period, Defendants have purchased targeted display advertising about the Tests. In particular, Defendants use Facebook's advertising platform to direct advertising about the Tests to consumers who fit certain demographics and/or have visited Defendants' webpage. Like Defendants' other advertising, these ads promote the tests as "Food Sensitivity Tests" and omit the material information in Paragraph 51.

60.    Fourth, throughout the class period, when submitting information to third-party retailers for advertising and sale on those third-party websites, Defendants again promote the tests as Food Sensitivity Tests and omit the material information in Paragraph 51. In other words, when Defendants sell the tests on Amazon.com, Target.com, and the websites of other retailers, Defendants must provide these retailers with information about the Tests, including the product

name and text for the product listing page, where a consumer can learn more about the product and add to their online cart for eventual purchase. Defendants have consistently instructed their third-party retailer partners to identify the product as a "Food Sensitivity Test," and in the text provided, have omitted the material information in Paragraph 51, resulting in the Tests being listed on the product listing pages on third-party retailers' websites in accordance with Defendants' instructions.

61.     Fifth, in connection with these various advertising campaigns, Defendants take other steps to suggest to consumers that they are a legitimate health services company, and the Tests offer a legitimate health benefit. For example, Defendants hold the Tests out as a product that one can purchase using Flexible Spending Account funds, which typically can only be spent on health care costs. Defendants also maintain a page on their website about the "The Process and Science Behind EverlyWell's Tests,"[24] which contains some scientific terminology, but does not actually say anything about the science behind why the results themselves are reliable. Instead, it merely discusses why self-administered home blood sampling provides labs with reliable information on which to perform a test; it does not actually say that the tests that are then performed are themselves reliable or useful, let alone explain any of the science.

62.     Finally, Defendants' presentation of Test results reinforces the false and misleading misrepresentations they make on the Test's packaging. Online portal test results flag foods as "normal" or "abnormal." The results advise consumers to "[c]onsider planning an elimination diet" with respect to those foods that do not fall in the 'normal reactivity' range. Defendants represent that they test each and every one of the listed foods, and for those that purport

---

[24] https://www.everlywell.com/blog/news-and-info/the-process-and-science-behind-everlywell-tests/ (last accessed May 10, 2023)

to show "Normal Reactivity" states, "these foods were measured in the normal range." Combined, these false and misleading representations lead reasonable consumers to believe that they have an adverse sensitivity to the "Mild," "Moderate," or "High"-rated foods and no adverse sensitivity to the "Normal"-rated foods, when in fact the Test can only identify whether the consumer has eaten a particular food recently. For example, someone with a nut allergy, who avoids consuming nuts, may be told that he or she has a "normal" (*i.e.*, medically safe) reactivity to nuts, when in fact that person should not be consuming nuts at all.

63.    No reasonable consumer, including Plaintiff, would purchase Defendants' Test Kits if he or she knew the above facts, namely that the Test had zero health benefit, was only able to identify whether a consumer had eaten a particular food recently, was ineffective at identifying adverse food sensitivities (or the absence thereof), and had been rejected by the scientific community for decades. Nor would a reasonable consumer pay for the privilege of foregoing their right to privacy with respect to medical and other information.

D.    **In Addition to Profiting Off Their False and Misleading Marketing through Sales of their Test Kits, Defendants Use Deceptive and Unfair Tactics to Obtain the Right to Profit off the Collection and Use of Consumers' Data for Free**

64.    Defendants add insult to injury in their marketing and sale of the Test Kits through their unconscionable acquisition of the right to use and sell Private Consumer Data. Not only do consumers lose money on a worthless test, but Defendants retain the blood samples and other information provided to them for their use and sale under the auspices of their website terms, which are unenforceable.

65.    After a consumer purchases an Everlywell Food Sensitivity Test Kit, they open the box, where instructions on how to complete the process are included. Before consumers mail in the sample, the instructions tell them how to perform the finger prick blood collection and

provide the necessary supplies for doing so. The instructions also tell consumers that Defendants will not release the results of the Test unless and until a consumer registers the Test on the Everlywell website. When a consumer visits the website and completes the registration process, Defendants purport to bind them to *additional* terms and conditions, viewable only if one visits a separate page on Defendants' website.

> **i.    Defendants hide from consumers at the point of sale their intention to retain, use, and sell private consumer data.**

66.    Defendants do not provide a way to complete the registration process prior to purchase. Because the information needed to register the Test is inside the box, a consumer cannot register it after purchase but before opening the box. More importantly, Defendants have designed the process so that consumers who purchase at third-party retailers, either online or brick and mortar stores, are unaware of the additional material terms and conditions that Defendants will bind them to during registration, after they have purchased the product (paid consideration) and opened the box.

67.    First, during the class period, nowhere on the front of the box do Defendants disclose that that there are additional terms that govern the transaction, let alone that Defendants will retain Private Consumer Data supplied for their use and sale.

68.    Second, during the class period, Defendants have never disclosed on the back of the box that they intend to retain Private Consumer Data supplied for their use and sale.

69.    Third, during the class period, when supplying text to third-party retailers for product listings, Defendants have never included language disclosing that they intend to retain Private Consumer Data supplied for their use and sale.

70.    Fourth, throughout the class period, Defendants have never disclosed in any of the social media and online advertising described herein that they will retain Private Consumer data

for their use and sale.

71.     Fifth, at no point during the class period, have Defendants included on the packaging or any of the aforementioned advertising that the purchase and Test would be governed by Defendants' privacy policy, which contains terms regarding Defendants' retention, use, and sale of the Private Consumer Data.

72.     Thus, consumers first learn of the need to register after opening their Test, at which point, the Kits are unreturnable. The Everlywell website states, for example, that "[i]n all cases, Everlywell cannot accept returned/unused kits. If you received your order and do not wish to continue with the test, we ask that you dispose of the kit." Consequently, consumers who purchase Defendants' Test Kits from third-party retailers (where Defendants do not disclose, adequately or at all, the registration process and/or Defendants' privacy policy) are unable get their money back (because they can no longer return the Kit) or access the results they paid for without accepting the terms that Defendants seek to foist on them after the point of sale.

**ii.     Defendants' inadequately disclosed post-purchase terms provide them with broad rights to use private consumer data.**

73.     Registration of a Test Kit requires consumers to create an account on the Everlywell.com website, which is a process that involves selecting a password and clicking a box saying that they have read and accept certain hyperlinked "Terms and Conditions." The terms includes additional hyperlinks to a Privacy Policy, Consent for Services, and Terms of Use (collectively "Post-Purchase Terms"), and states that a consumer forms an agreement with EWI "[b]y clicking on the box."

74.     However, consumers are not required to actually click on the hyperlink or read through the Terms and Conditions, nor any of the other documents that comprise the Post-Purchase Terms in order to create an account or otherwise complete the registration. Rather, a

consumer is deemed to have agreed – notwithstanding that they receive no consideration in exchange for entering into all of these various agreements.

75.    Consumers certainly would not pay for a Test Kit merely for the privilege of opening the box or the experience of pricking their finger and collecting their blood. Rather, they pay for the results/health information that Defendants falsely promise to provide. Because consumers have no other option but to agree if they want to access the results that they already paid for, each of these three agreements should be held unenforceable.

76.    A review of the Post-Purchase Terms, moreover, makes clear that in addition to profiting off of their false and misleading marketing of their Test Kits, Defendants seek to covertly obtain personal and private information, including Private Consumer Data, from a consumer for free, all while evading liability for deceiving consumers with respect to both. In other words, not only are Defendants charging consumers for worthless Tests through false and misleading representations regarding the Test's health benefits, Defendants are deceptively using the sale of their Test to obtain personal and private information from consumers without disclosing – adequately, if at all – this fact to consumers at the point of sale from third-party retailers and without providing these consumers with any consideration for their data.

77.    For example, EWI's Privacy Policy allows Defendants to use consumers' personal information, including protected health information, "[f]or research purposes, for marketing/promotional purposes and to provide anonymous reporting for internal and external clients and business partners," as well as to market "third parties' goods and services that may be of interest to you." The Privacy Policy further dictates that consumers are agreeing to the sale of their Private Consumer Data, including medical information, in the event Defendants transfer such assets, notwithstanding that Defendants' CEO has publicly taken the position that

Defendants will not sell consumer data.

78.    EWI's Consent for Services gives Defendants the ability to "retain any information collected about you for as long as we are required to maintain it . . . for a legal or business necessity," and likewise allows Defendants to use consumer information and Test Results for "validation, educational, and/or research purposes." Defendants further contemplate developing commercial products from blood sample information and require consumers to forgo any rights in such developments. In addition, Defendants authorize themselves to retain consumers' information wherever they "reasonably believe that we have a legitimate reason to do so," even if a consumer requests otherwise.

79.    Finally, EWI's User Agreement mandates that consumers consent to personal information "being transferred in the event of a business transition," which appears to give Defendants the right to sell this Private Consumer Data. Moreover, Defendants' confusing and opaque corporate structure suggest that Private Consumer Data acquired by EWI and/or EHI could be shared with the other divisions or subsidiaries of EHI. So not only are consumers paying for Defendants' worthless Test, they are also providing Defendants with valuable data for Defendants' own personal gain for free, a fact that is not adequately disclosed prior to purchase, if at all.

80.    The Private Consumer Data supplied by consumers to Defendants has tremendous market value. Through its false and deceptive marketing and sale of the Testing Kits, Defendants have acquired blood samples from hundreds of thousands, if not millions of people, which it can then use to extract information for a limitless number of commercial uses. The cost to a commercial venture to acquire a similar bank of information would be enormous. While consumers may freely donate to blood banks as an act of charity, no reasonable consumer would

freely donate blood samples that are tied to other private and identifiable information about themselves to a commercial venture; rather, commercial medical research companies typically must compensate those willing to provide samples for the valuable health information they provide.

81.    The fact that Defendants state that they will use the data obtained for research purposes suggests that Defendants believe they have the right to and in fact do use consumers' blood samples for research and to develop new products and tests for their own profit. Indeed, in recent years, Defendants have grown and expanded their offerings to a wide array of other kinds of home tests that purport to have a health or medical benefit. And even if Defendants have not yet used consumers' blood samples or the information gleaned from them to develop new products or otherwise profit, they retain the right to do so.

82.    In addition to Defendants' use of the Private Consumer Data to develop their own products, Defendants' collection of this information is an asset that it now possesses that can be sold and re-sold to others. Indeed, data gathered on people can be sold to third-party vendors and data brokers for a limitless number of commercial uses. Government agencies often buy, or even subpoena data for surveillance and investigative work, and their methods could be seen as an end-run around Fourth and Fifth Amendment protections. Other commercial ventures may also be interested in the Private Consumer Data for their own product development, as a way to avoid the much more costly and time-consuming process of collecting the information themselves by compensating consumers.

### E.    Plaintiff's Purchase and Use of the Test Kit

83.    In July 2022, while at her home in Massachusetts, Plaintiff purchased Everlywell's Food Sensitivity Test that tests for 96 foods from Target's website. Prior to purchasing

Defendants' Test, Plaintiff had looked into the product online, but at no time during her review did she see the omissions in Paragraph 51.

84.    After purchasing the Test and receiving it in the mail, Plaintiff completed the Test, taking a blood sample and submitting it along with her personally identifiable information, via mail to Defendants, consistent with the instructions provided.

85.    On August 11, 2022, Plaintiff received her 'test results' via the Everlywell online portal, which were unhelpful, inconclusive, and unreliable. The results claimed she had a 'mild reactivity' to eight food items and a 'normal reactivity' to the remaining items. But the results were inconsistent with some of the information Plaintiff already knew. For example, Plaintiff knew she had an allergy to certain foods, such as shellfish, but the results did not flag those foods as problematic. Plaintiff had also eaten eggs the night before without any discomfort, but the results indicated she had a sensitivity to eggs.

86.    Plaintiff would not have purchased the Test Kit, or alternatively would not have paid a premium for it, if she had known the Test was ineffective at identifying adverse food sensitivities (and by extension foods that presented no adverse effects). Nor would Plaintiff have purchased the product if she knew the widespread rejection of the testing method by the medical and scientific community. And Plaintiff would not have submitted her Private Consumer Data, or would have only submitted it under limited, restricted conditions.

87.    Accordingly, Plaintiff, and all Class members, lost money as a result of Defendants' omissions and misrepresentations and received a worthless product. Alternatively, they did not receive the benefit-of-the-bargain and instead, received a product that was worth far less than the product as was represented.

88.    If Defendants are allowed to continue selling their product with the deceptive and

unfair omissions and misrepresentations described herein, Plaintiff and other reasonable consumers would be induced into purchasing the product again with the reasonable belief that Defendants' product does what it purports to do.

## CLASS ALLEGATIONS

89.     Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

90.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiff brings this action individually and on behalf of the following Class and Subclass:

> **Class: All individuals who purchased an Everlywell Food Sensitivity Test Kit for personal, family, or household use within the applicable statute of limitations, except for those who purchased the Test in the state of Texas.**

> **Massachusetts Subclass: Class Members who purchased the Test in the state of Massachusetts.**

91.     Plaintiff represents, and is a member of, this Class and Subclass.

92.     Excluded from the Class are the Defendants, and any entities in which the Defendants have a controlling interest, the Defendants' employees, any Judge to whom this action is assigned and any member of such Judge's staff and immediate family, as well as claims for personal injury or wrongful death.

93.     Plaintiff reserves the right to amend or modify the Class and Subclass definitions after having an opportunity to conduct discovery.

94.     The Class and Subclass meet the criteria for certification under Rule 23(a), (b)(2), (b)(3), and (c)(4). Plaintiff and all members of the Class have been harmed by the acts of the Defendants. Class-wide adjudication of Plaintiff's claims is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used

to prove those elements in individual actions asserting the same claims.

95.    **Numerosity. Fed. R. Civ. P 23(a)(1).** The members of the Class and Subclass are so numerous that individual joinder of all class members is impracticable. Although the exact number of members is unknown at this time, it can readily be determined from the internal business records of Defendants or the retailers and distributors of the Test, and Class members may be notified of the pendency of this action by published and/or mail/emailed notice. Plaintiff reasonably estimates that there are thousands of members of the Class.

96.    **Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Common questions of law and fact exist as to all members of the putative class that will drive the litigation and predominate over any questions affecting only individual class members. Common questions include, but are not limited to:

a.    Whether Defendants' Food Sensitivity Test Kit has any medical value;

b.    Whether Defendants' Food Sensitivity Test Kit is worthless;

c.    Whether Defendants engaged in omissions or misrepresentations regarding the health benefits or value of its Food Sensitivity Test Kit;

d.    Whether Defendants' conduct is likely to deceive an objectively reasonable consumer;

e.    Whether Defendants' omissions and misrepresentations regarding the health benefits or value of its Food Sensitivity Test Kit described herein constitute unfair or deceptive acts or practices in violation of state consumer protection laws;

f.    Whether Defendants have been unjustly enriched;

g.    Whether Plaintiff and the Class Members are entitled to damages and restitution, including for the value of the purchase price and the Private Consumer Data

provided, and the proper measure of Plaintiff's and the Class Members' losses.

97.     **Typicality**. **Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of each putative class member and are based on the same facts and legal theories as each of the class members. Plaintiff, like all members of the Class, purchased one of Defendants' Food Sensitivity Test Kits from a third-party retailer. Plaintiff, like all Class members, were thus subject to Defendants' common misrepresentations and omissions through the uniform product name and packaging of the Everlywell Food Sensitivity Test Kits, which together misleadingly and deceptively claim that the Test has medical value by purportedly being able to identify adverse food sensitivities, notwithstanding that there has been widespread rejection of these claims by the medical community, which has overwhelmingly urged consumers not to use these Tests. Plaintiff is entitled to relief under the same causes of action as the other members of the putative class.

98.     **Adequacy of Representation**. **Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representatives of the putative Class and Subclass because their interests coincide with, and are not antagonistic to, the interests of the members of the Class that they seek to represent. Plaintiff has retained counsel competent and highly experienced in complex consumer class action litigation, who intend to prosecute the action vigorously. Plaintiff and her counsel will fairly and adequately protect the interests of the members of the Class.

99.     **Superiority**. **Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to

effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof. Plaintiff is not aware of any other current pending litigation against Defendants to which any Class member is a party involving the subject matter of this suit, and the Action presents no difficulties that will impede its management by the Court as a class action.

100.    **Injunctive Relief Appropriate for the Class.  Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the entire Class, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to Plaintiff and putative Class members. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that could establish incompatible standards of conduct for Defendants. Injunctive relief is necessary to prevent further fraudulent and unfair business practices by Defendants including Defendants' continued use of Private Consumer Data collected from consumers without the exchange of consideration, as well as the potential that Defendants will rebrand or redesign their label/packaging for purposes of continuing to sell their Food Sensitivity Test Kits with the false and misleading omissions and misrepresentations described herein such that a reasonable consumer would not know it was the same worthless Test by virtue of their participation or membership in this Class action.

## CLAIMS FOR RELIEF

101.    Based on the foregoing allegations, Plaintiff's claims for relief include the following:

### COUNT I
**Violations of Mass. Gen. Laws Ch. 93A and the Consumer Protection Acts of 48 States On behalf of the Multistate Class and Massachusetts Subclass**

102.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

103.    On behalf of the Multistate Class, Plaintiff brings these statutory consumer protection claims pursuant to the substantially similar "Consumer Protection Acts" identified below, all of which were enacted and designed to protect consumers against unlawful, fraudulent, and/or unfair business acts and practices. On behalf of herself and the Massachusetts Subclass, Plaintiff brings these claims pursuant to Mass. Gen. Laws, Ch. 93A. Neither Defendant maintains a place of business or keeps assets in the commonwealth of Massachusetts, so the demand requirements of Mass. Gen. Laws, Ch. 93A, § 9(3) do not apply.

104.    Together with Chapter 93A of Massachusetts's General Laws, the following consumer protection acts are collectively referred to herein as the "Consumer Protection Acts":

a.    ALA. CODE § 8-19-1 *et seq.* (Alabama);

b.    ALASKA STAT. ANN. § 45.50.471 *et seq*. (Alaska);

c.    ARIZ. REV. STAT. ANN. § 44-1521 *et seq*. (Arizona);

d.    ARK. CODE ANN. § 4-88-101 *et seq*. (Arkansas);

e.    CAL. CIV. CODE §1750 et seq. (California);

f.    COLO. REV. STAT. ANN. § 6-1-101 *et seq*. (Colorado);

g.    CONN. GEN. STAT. ANN. § 42-110a *et seq* (Connecticut);

h.      DEL. CODE ANN. tit. 6, § 2511 *et seq*. (Delaware);

i.      D.C. CODE ANN. § 28-3901 *et seq*. (District of Columbia);

j.      FLA. STAT. ANN. § 501.201 *et seq*. (Florida);

k.      GA. CODE ANN. § 10-1-370 *et seq*. and GA. CODE ANN. § 10-1-390 et seq. (Georgia);

l.      HAW. REV. STAT. ANN. § 480-1 *et seq*. and HAW. REV. STAT. ANN. § 481A-1 et seq. (Hawaii);

m.      IDAHO CODE ANN. § 48-601 *et seq*. (Idaho);

n.      815 ILCS 505/1 *et seq*. (Illinois);

o.      IND. CODE ANN. § 24-5-0.5-1 *et seq*. (Indiana);

p.      IOWA CODE 714H.1, *et seq*. (Iowa);

q.      KAN. STAT. ANN. § 50-623 *et seq*. (Kansas);

r.      KY. REV. STAT. ANN. § 367.110 *et seq*. (Kentucky);

s.      LA. STAT. ANN. § 51:1401 *et seq*. (Louisiana);

t.      ME. REV. STAT. tit. 5, § 205-A *et seq*. (Maine);

u.      MD. CODE ANN., COM. LAW § 13-101 *et seq*. (Maryland);

v.      MICH. COMP. LAWS ANN. § 445.901 *et seq*. (Michigan);

w.      MINN. STAT. ANN. § 325F.68 *et seq*., MINN. STAT. ANN. § 325D.09 *et seq*., MINN. STAT. ANN. § 325D.43 *et seq*., and MINN. STAT. ANN. § 325F.67 (Minnesota);

x.      MISS. CODE ANN. § 75-24-1 *et seq*. (Mississippi);

y.      MO. ANN. STAT. § 407.010 *et seq*. (Missouri);

z.      MONT. CODE ANN. § 30-14-101 *et seq*. (Montana);

aa.      NEB. REV. STAT. ANN. § 59-1601 *et seq*. (Nebraska);

bb.      NEV. REV. STAT. ANN. § 41.600 and NEV. REV. STAT. ANN.

§598.0903 *et seq*. (Nevada);

cc.    N.H. REV. STAT. ANN. § 358-A:1 *et seq*. (New Hampshire);

dd.    N.J. STAT. ANN. § 56:8-1 *et seq*. (New Jersey);

ee.    N.M. STAT. ANN. § 57-12-1 *et seq*. (New Mexico);

ff.    N.Y. GEN. BUS. LAW. § 349 *et seq*. (New York);

gg.    N.C. GEN. STAT. ANN. § 75-1 *et seq*. (North Carolina);

hh.    N.D. CENT. CODE ANN. § 51-15-01 *et seq*. (North Dakota);

ii.    OHIO REV. CODE ANN. § 1345.01 *et seq*. (Ohio);

jj.    OKLA. STAT. ANN. tit. 15, § 751 *et seq*. (Oklahoma);

kk.    OR. REV. STAT. ANN. § 646.605 *et seq*. (Oregon);

ll.    73 PA. STAT. ANN. § 201-1 *et seq*. (Pennsylvania);

mm.    R.I. GEN. LAWS ANN. § 6-13.1-1 *et seq*. (Rhode Island);

nn.    S.C. CODE ANN. § 39-5-10 *et seq*. (South Carolina);

oo.    S.D. CODIFIED LAWS § 37-24-1 *et seq*. (South Dakota);

pp.    TENN. CODE ANN. § 47-18-101 *et seq*. (Tennessee);

qq.    UTAH CODE ANN. § 13-11-1 *et seq*. (Utah);

rr.    VT. STAT. ANN. tit. 9, § 2451 *et seq*. (Vermont);

ss.    VA. CODE ANN. § 59.1-196 *et seq*. (Virginia);

tt.    WASH. REV. CODE ANN. § 19.86.010 *et seq*. (Washington);

uu.    W.VA. CODE ANN. § 46A-6-101 *et seq*. (West Virginia);

vv.    WIS. STAT. ANN. § 100.20 (Wisconsin); and

ww.    WYO. STAT. ANN. § 40-12-101 *et seq*. (Wyoming).

105.    Plaintiff and the multistate Class members have standing to assert claims under the above-listed Consumer Protection Acts because they are consumers within the meaning of the Consumer Protection Acts; the Testing Kits were purchased for personal and household use and are consumer transactions; and Defendants' practices were addressed to the market generally and otherwise implicate consumer protection concerns. At all relevant times, Defendants conducted "trade" and "commerce" within the meaning of the Consumer Protection Acts. *See, e.g.*, Mass. Gen. Law Ch. 93A, §1(b).

106.    Defendants have committed fraudulent, deceptive and/or unfair business acts and practices by engaging in the acts and practices alleged herein. These actions had the capacity to, were likely to, and did in fact, mislead consumers into purchasing the Testing Kits and supplying their Private Consumer Data.

107.    Plaintiff reiterates the specific circumstances surrounding Defendants' deceptive, fraudulent, and unfair business acts, including their advertising:

a.    *Who:* Defendants made (or caused to be made) the material misrepresentations and omissions described herein. From 2015 to sometime in early 2021, EWI directed and controlled the marketing for the Test Kits and made these representations and omissions. Since the creation of EHI, EHI has directed and controlled the marketing for the Test Kits, directly through EWI, and/or assumed responsibility for EWI's actions.

b.    *What:* Defendants' long term, common false advertising scheme to hold the Test Kits out as tests that offer legitimate medical and health benefits and information to consumers about the foods they eat and the effects these foods have on their bodies. Defendants' long term, coordinated scheme was comprised of material misrepresentations, false statements of fact, and omissions, which appear on the packaging for the Test Kits, and are reiterated and reinforced on

Defendants' website and social media pages, and include misrepresentations, falsehoods, and omissions such as:

    i.    Misrepresenting (through its very name) that the Test Kit is a "Food Sensitivity Test," thereby misleading reasonable consumers to believe that it: (i) identifies foods that cause adverse sensitivities, which it does not, and (ii) identifies foods that do *not* cause adverse sensitivities, which it does not— in fact the Test only identifies the levels of certain proteins that are not indicative of adverse food sensitivities at all, but rather whether a food has been regularly consumed prior to the blood test;

    ii.    Misrepresenting that the Test Kit will test 96 [or 206] foods for Immunoglobulin G (IgG) antibody reactivity, thereby misleading reasonable consumers to believe: (i) that the presence of IgG antibodies are indicative of adverse bodily reactions, which they are not, (ii) the Test Kit actually "tests" whether one is adversely sensitive to each of the enumerated food items, which it does not; and (iii) the Test Kit actually determines which of the enumerated food items do *not* cause adverse sensitivities and reactions, which it does not;

    iii.    Misrepresenting that the Test Kit has medical acceptance through misleading claims that it is a "Physician-approved lab test" that uses "CLIA-Certified Lab Partners," when in fact the scientific medical community has roundly rejected and recommended against using tests like these to identify adverse food sensitivities because they are ineffective and counterproductive to overall health;

iv.     Omitting that home, over-the-counter IgG testing is unreliable and incapable of identifying food sensitivities or otherwise providing any sort of health or medical benefit; and

v.      Failing to adequately disclose that Defendants would seek to bind consumers to a clause asserting a purported right to use Private Consumer Data for Defendants' benefit and profit without consideration.

c.      **_Where:_** The false advertising occurred on Defendants' Test packaging, Defendants' website, www.everlywell.com, Everlywell social media pages, and the webpages and store shelves of third-party retailers through which Defendants sold their products, including Target, CVS, Walgreens, and Amazon.com. In particular, the misleading product name "Food Sensitivity Test" appears on the packaging and every medium in which Defendants mention or depict the Test. And the false advertising scheme was transmitted, distributed, displayed, and occurred to Class members residing throughout the country, including Massachusetts; and displayed to Plaintiff in Massachusetts, at retailers near her home, on Defendants' website, and on Target's website.

d.      **_When:_** Upon information and belief, Defendants engaged in the false advertising continuously during the Class Period, and continue to do so. Plaintiff encountered the representations and omissions described herein on the date of her purchase in the weeks and months leading up to July 2022, when she purchased the product, and the harm continues to the present, as Defendants continue to possess her Private Consumer Data.

e.      **_Why:_** Defendants engaged in the material misrepresentations, false statements of fact, and omissions described herein with the intent to induce Plaintiff and the Class to rely upon them in purchasing the Test Kit and providing Private Consumer Data.

108.    As a result of Defendants' false and deceptive advertising and omissions, Plaintiff, the Class, and Subclass were deceived into (1) purchasing the Test Kits; and (2) providing Private Consumer Data. They did so on the belief that the Test Kit identifies, for each of the foods enumerated on the Test Kit packaging, whether one has an adverse sensitivity to that food or not, and without being informed at the point of sale as to Defendants' intended use of their Private Consumer Data.

109.    Defendants' omissions and misrepresentations (as detailed herein) injured Plaintiff, the Class, and the Subclass. As a direct and proximate result of Defendants' deceptive conduct, each has suffered actual damages by purchasing a worthless (and potentially dangerous) product that failed to do precisely what its name entails: test food sensitivities. Alternatively, each has suffered damages by paying a premium for this test. In addition, each was damaged in that they were deceived into providing valuable Private Consumer Data for Defendants' commercial benefit without adequate consideration or renumeration.

110.    Defendants knew and intended that Plaintiff, the Class, and Subclass would be deceived and rely on the deceptive, fraudulent, and unfair business acts and practices alleged herein.

111.    Defendants' actions, which were willful and wanton, constitute intentional violations of the Consumer Protection Acts.

112.    Defendants' deceptive, fraudulent, and/or unfair business acts and practices described herein are continuing in nature. Plaintiff and the members of the Class and Subclass have been damaged as a proximate result of Defendants' course of conduct and their violations of the Consumer Protection Acts for all of the reasons set forth above, including through Defendants' ongoing claim of ownership over their Private Consumer Data.

113.    Plaintiff, the Class, and Subclass members respectfully request damages, equitable monetary relief, injunctive relief, declaratory relief, and attorneys' fees, costs, and expenses to be assessed against Defendants, within the limits set forth by applicable law.

**COUNT II**
**Quasi-Contract Claim for Restitution ("Unjust Enrichment")**
**On behalf of the Multistate Class and Massachusetts Subclass**

114.    Plaintiff restates each of the allegations in the preceding paragraphs as if set forth at length herein.

115.    To the extent it is required, this claim is alleged as an alternative theory of relief.

116.    No applicable contract existed between Plaintiff or Class members and Defendants and neither Plaintiff nor Class and Subclass members have an adequate remedy at law.

117.    Plaintiff and the Class conferred a benefit on Defendants by purchasing the Everlywell Food Sensitivity Test Kits and providing Private Consumer Data. Defendants knew or should have known of the benefit conferred by Plaintiff and the putative Class and voluntarily accepted and retained this benefit through receipt of funds paid and Private Consumer Data provided in connection with the purchase by Class members of Defendants' Food Sensitivity Test Kits.

118.    As noted above, Defendants are well aware that the overwhelming consensus of the medical community has recommended against the use of IgG tests like Defendants' Food Sensitivity Test Kits on the basis that they have no medical value and can even be harmful to consumers' health. Yet, Defendants continue to promote their Test as having health benefits, both through their labeling and packaging of the Tests, misleading reasonable consumers into paying significant sums and providing valuable Private Consumer Data for what is in reality a worthless

product. Plaintiff and Class members would not have purchased Defendants' Food Sensitivity

Test and provided Private Consumer Data, or would have paid less or insisted on restraints on the

usage of the Data, if not for Defendants' false and misleading omissions and misrepresentations,

such that it would be inequitable for Defendants to retain the benefits they received from Plaintiff

and the putative Class.

119.    Accordingly, Plaintiff and each similarly situated Class member seek to recover

from Defendants the amounts by which they have been unjustly enriched, namely the amount and

economic value received by Defendants from: (1) purchases made by Plaintiff and Class and

Subclass members of Defendants' Food Sensitivity Test Kits; and (2) their Private Consumer

Data, including information derived therefrom, and the sale or transfer of any data, products,

trade secrets, or other assets or commercial ventures that derive from that Private Consumer Data.

### COUNT III
### Common Law Fraud, Deceit, and/or Misrepresentation
### On behalf of the Massachusetts Subclass

120.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

121.    Throughout the last four years, Defendants fraudulently and deceptively informed

Plaintiff and Subclass members that Defendants' Test Kits could test them for food sensitivities,

while simultaneously omitting material information about the tests, as described in Paragraph

107.b, *supra*.

122.    These misrepresentations and omissions were known exclusively to, and actively

concealed by, Defendants, not reasonably known or knowable to Plaintiff or Subclass members,

and material at the time they were made. Defendants intended to deceive consumers through their

product packaging and advertising as to its ability to identify food sensitivities, when Defendants

knew their Test Kits had no such functionality or medical/health benefit whatsoever. Defendants intentionally, knowingly, and recklessly made these misrepresentations to induce Plaintiff and the Subclass to purchase the Test Kits and provide Private Consumer Data. Defendants thereby allowed their packaging, labels, advertisements, promotional materials, and websites to intentionally mislead consumers, such as Plaintiff and the Subclass.

123.    Plaintiff and the Subclass did in fact rely on these misrepresentations and omissions and purchased the Test Kits and provided the Private Consumer Data to their detriment. Given the deceptive manner in which Defendants advertised, represented, and otherwise promoted the Test Kits, Plaintiff's and the Subclass's reliance on Defendants' misrepresentations was justifiable.

124.    Defendants' misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and the Subclass as to whether to purchase the Kits and provide Private Consumer Data. In misleading Plaintiff and the Subclass, Defendants breached their duty to them, and gained financially from and as a result of this breach of duty.

125.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Subclass have suffered actual damages in that they have purchased Test Kits that are worthless, or at a minimum, worth less than the price they paid, and that they would not have purchased at all had they known the truth. They have also suffered actual damages from providing to Defendants Private Consumer Data.

126.    Plaintiff and the Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

**COUNT IV**
**Negligent Misrepresentation**
**On behalf of the Massachusetts Subclass**

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    Defendants had a duty to Plaintiff and the Subclass to exercise reasonable and ordinary care in the formulation, testing, manufacturing, marketing, distribution, and sale of the Test Kits and acquisition of Private Consumer Data.

129.    Defendants breached their duty to Plaintiff and the Subclass by formulating, testing, manufacturing, advertising, marketing, distributing, and selling products to Plaintiff and the Subclass that do not work as advertised by Defendant and by asserting a right of ownership and control over the Private Consumer Data, as described in Paragraph 107.b, *supra*. Defendants knew or should have known the Test Kits were not suitable for their intended use and were otherwise not as warranted and represented by Defendants.

130.    As a direct and proximate result of Defendants' conduct, Plaintiff and the Subclass have suffered actual damages in that they have purchased Test Kits that are worthless, or at a minimum, worth less than the price they paid, and that they would not have purchased at all had they known the truth. They have also suffered actual damages from providing to Defendants their Private Consumer Data.

131.    Plaintiff and the Subclass seek actual damages, injunctive and declaratory relief, attorneys' fees, costs, and any other just and proper relief available.

## DEMAND FOR JURY TRIAL

132.    Plaintiff, individually and on behalf of all others similarly situated, hereby demands a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment on behalf of

themselves and the class they seek to represent against Defendants for:

A.     Certification for this matter to proceed as a class action pursuant to Federal Rule of Civil Procedure 23, appointing Plaintiff as representative of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class;

B.     Declaratory relief and injunctive relief requiring Defendants to purge any personal information collected from putative Class members and barring Defendants from rebranding for purposes of making the same false and misleading representation under a different brand name or using different packaging such that a reasonable consumer would not know it was the same worthless Test by virtue of their participation or membership in this Class action;

C.     Actual and punitive damages where applicable;

D.     Equitable relief (including restitution and/or restitutionary disgorgement) as pled herein;

E.     The maximum allowable legal rate of prejudgment and post-judgment interest on any monetary damages awarded;

F.     An award of attorneys' fees and expenses; and

G.     Such other or further relief as the Court deems just and proper.

DATED: May 10, 2023                         Respectfully submitted,

                                            */s/ Gemma Seidita*
                                            Gemma Seidita (BBO # 704591)
                                            Anna C. Haac (*pro hac vice* forthcoming)
                                            Kristen G. Simplicio (*pro hac vice* forthcoming)
                                            Leora N. Friedman (*pro hac vice* forthcoming)
                                            **TYCKO & ZAVAREEI LLP**
                                            2000 Pennsylvania Avenue NW, Suite 1010
                                            Washington, D.C. 20006
                                            Telephone: (202) 973-0900
                                            Facsimile: (202) 973-0950

Email: gseidita@tzlegal.com
       ahaac@tzlegal.com
       ksimplicio@tzlegal.com
       lfriedman@tzlegal.com

Alan M. Feldman
Edward S. Goldis
Zachary Arbitman
**FELDMAN SHEPHERD WOHLGELERNTER TANNER WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
Telephone: (215) 567-8300
Facsimile: (215) 567-8333
Email: afeldman@feldmanshepherd.com
       egoldis@feldmanshepherd.com
       zarbitman@feldmanshepherd.com

*Counsel for Plaintiff and the
Proposed Class*