# United States Court of Appeals
## For the First Circuit

No. 23-1727

JOYCE TOTH,

Plaintiff, Appellant,

v.

EVERLY WELL, INC. and EVERLY HEALTH, INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Howard, Circuit Judges.

Stefanie L. Ostrowski, with whom Anna C. Haac, Gemma Seidita, Kristen G. Simplicio, Leora N. Friedman, Tycko & Zavareei LLP, Zachary Arbitman, Alan M. Feldman, Edward S. Goldis, Feldman Shephard, Wohlgelernter Tanner Weinstock & Dodig LLP, Jennifer D. Bennett, Matthew W.H. Wessler, Robert D. Friedman, Alisa Tiwari, and Gupta Wessler LLP were on brief, for appellant.

Katherine M. Peaslee, with whom Krysta Kauble Pachman, Susman Godfrey LLP, Fabien M. Thayamballi, Shapiro Arato Bach LLP, William F. McGonigle, and Arrowood LLP were on brief, for appellee.

September 25, 2024

HOWARD, **Circuit Judge**.  While registering an at-home lab test on the testing company's website, Joyce Toth clicked on a checkbox indicating that she read and accepted certain terms and conditions, which were contained in a linked "User Agreement." Her representation was only half true.  Toth, like countless consumers before her, did not read the terms and conditions that she ostensibly accepted.  Had she reviewed the User Agreement and documents linked to it, she would have discovered arbitration provisions (hereafter sometimes referred to collectively as the "arbitration agreement") covering almost all disputes related to her use of the test.  Relying on the arbitration agreement, the district court dismissed Toth's putative class action against the testing company.  Toth now challenges the district court's ruling, arguing that no contract was formed between the company and herself and that, even if one were, the arbitration agreement within was invalid.  Unfortunately for Toth, however, she formed a valid "clickwrap" contract with the company when she clicked on the checkbox.  Accordingly, we affirm.

### I.

### A.

Everly Health, Inc. and its subsidiary Everly Well, Inc. (collectively, "Everlywell") sell health-related services and commodities.  Everlywell offers a wide array of at-home health tests, but few are more popular than its "Food Sensitivity Test."

Relying on a blood sample provided by the user, the Food Sensitivity Test claims to assess the user's "reactivity to 204 common foods that may be causing discomfort" by "measur[ing] [the] user's immunoglobulin G (IgG) response to various foods." Prospective users can purchase test kits directly from Everlywell's website or indirectly from retailers, such as in physical stores or online from Target. The test kit's packaging suggests a simple process for obtaining results -- "Purchase Kit . . . Collect Sample & Send . . . Receive Fast Online Results" -- but also stipulates that "[p]urchase, registration, and use are subject to agreeing to the Everlywell User Agreement, which can be read at everlywell.com/terms[.]"

        Because the test is designed to be taken at home, instructions enclosed within each kit explain how to administer the blood test, how to send the sample to Everlywell's laboratory, and how to access test results. The instructions also direct the user to create an account on Everlywell's website and register the test kit, warning that "[t]he lab <u>can only</u> process your sample if you . . . register your kit." The account-creation page on its website asks users to input some basic information and then click a checkbox indicating that they "have read and accept the Terms and Conditions[.]" The phrase "Terms and Conditions" is highlighted in green font and embedded with a link. The checkbox and accompanying text are located directly above the "Create

Account" button, and a user cannot register a kit without first clicking the checkbox.

The "Terms and Conditions" link connects users to Everlywell's User Agreement. In its opening sentence, the User Agreement states that "[b]y clicking on the box, you indicate that this User Agreement is a binding agreement between you . . . and Everly Well, Inc. . . . and that you have read and understood the following terms . . . ." A few lines below, under the bolded subheading "Access to the Services and the Site[,]" the User Agreement stipulates that "[s]ubject to your compliance with the terms of this User Agreement . . . Everlywell grants you a personal, limited, terminable, non-exclusive, non-transferable right to access the Site and use the Services[.]"

The rest of the User Agreement further outlines the terms. The "Fees and Payment" section promises that Everlywell will "refund the applicable fees if, after the applicable review, a Health Consultant does not authorize and order the test(s) you requested." The "Limitation of Liability" section purports to relieve Everlywell of liability for consequential, punitive, and other special damages. It also limits recoverable damages to the greater of "(i) THE AMOUNT ACTUALLY PAID BY YOU FOR THE SERVICES AND (ii) ONE HUNDRED DOLLARS (U.S.)."

An arbitration clause resides in the "Dispute Resolution" section of the User Agreement.[1] That section first requires both Everlywell and the customer to "use their best e orts [sic] to settle" any disputes that arise between them. It then sets forth mutual promises to arbitrate "in Austin, Texas, in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the 'AAA')[.]" Intellectual property disputes and suits seeking preliminary specific performance or injunctive relief are excepted from the arbitration provision. The Dispute Resolution section ends by providing that "fees charged by the AAA and arbitrator shall be shared equally by the parties." Following the Dispute Resolution section, the "Governing Law" section stipulates that Texas law will apply to any disputes relating to the User Agreement; the "Class Action Waiver" section bars collective and class actions against Everlywell; and the "Limitation of Time to File Claims" section imposes a one-year time bar on users' claims against Everlywell.

The User Agreement, in turn, links to three other documents: Everlywell's Privacy Notice, Consent for Services, and Terms of Use. The Privacy Notice and Consent for Services both purport to give Everlywell various rights to its users' "de-identified information," and the Terms of Use contains

---

[1] Other documents linked to the User Agreement also contain arbitration clauses that are materially identical to this one.

disclaimers of warranties.  Both the Privacy Notice and Terms of Use contain unilateral-modification clauses.

### B.

Plaintiff-Appellant Joyce Toth purchased a Food Sensitivity Test from Target's website for $119.99.  Following the instructions enclosed in the test's box, she then created an account, clicked the checkbox indicating that she "read and accept[ed]" the User Agreement, and sent her completed kit to Everlywell's labs.  When she eventually received her results, though, Toth was confused.  Everlywell reported that she had a sensitivity to eggs, but Toth had eaten eggs the night before "without any problem[,]" and the test did not indicate that she was sensitive to any foods to which she knew that she was allergic.  Toth alleges that her surprising results align with the actual science underlying the Food Sensitivity Test.  IgG levels, she contends, do not track an individual's sensitivity to food; rather, "elevated IgG . . . indicate[s] that a food has been regularly consumed within the several months before the test."  If this contention is true, Everlywell's test does not tell users whether they are sensitive to certain foods; it only tells users which foods they have recently eaten.

Toth filed this putative class action in federal district court, alleging that Everlywell "deceptively markets its tests and misleads consumers into providing their personal medical

information for Everlywell's commercial use."   In response, Everlywell moved to compel arbitration under the Federal Arbitration Act ("FAA") and, alternatively, to dismiss Toth's complaint.   Tasked with the burden of establishing that the parties entered a valid, enforceable agreement to arbitrate, Everlywell asserted in part that the parties had formed a "clickwrap" contract when Toth checked the "I accept" checkbox before creating her account.   Toth opposed Everlywell's motion, advancing a host of contractual defenses.   She argued that the User Agreement lacked consideration because Everlywell had already promised to deliver her test results; that Everlywell did not provide reasonable notice of the terms of the contract or secure Toth's assent to it as required by Massachusetts law; that the contract was "illusory" because Everlywell retained unilateral-modification power; and that the arbitration provision was procedurally and substantively unconscionable.[2]

After allowing the parties to conduct partial discovery, the district court granted Everlywell's motion to compel arbitration.   The court held that Everlywell satisfied its burden of proving that the contract to arbitrate is valid and enforceable by providing "evidence that Toth affirmatively checked a box

---

[2] Toth also raises arguments based on Massachusetts's unfair trade practices statute and equitable estoppel.   Because she did not raise these claims below, we decline to address them.   See Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 59 (1st Cir. 2021).

accepting its Terms and Conditions[.]"   And it found Toth's arguments to the contrary unavailing.  The contract did not lack consideration, the court reasoned, because Everlywell was not obligated to send Toth her test results "at the moment of purchase[;]" reasonable consumers would expect that they must take further action, such as collecting and submitting a blood sample, before Everlywell can perform its contractual obligation.

The court went on to conclude that, by requiring Toth to affirmatively check a highlighted "Terms and Conditions" checkbox on the account-creation page, Everlywell sufficiently notified her of the contract's terms and secured her effective assent.  Despite Toth's claims, the court went on, she did have a "meaningful choice or opportunity" to reject the terms because the User Agreement explicitly stated that she was free to turn down the terms. Further, the court noted that Everlywell's website and Target's website both authorized returns of the test kit.  Finally, the court dismissed Toth's validity challenge to the arbitration agreement after noting that her "procedural unconscionability arguments merely recycle under a new label her same previously rejected arguments."

Toth then filed this timely appeal.

## II.

The FAA codifies the "fundamental principle that arbitration is a matter of contract."  Rent-A-Center, W., Inc. v.

Jackson, 561 U.S. 63, 67 (2010).   It provides that arbitration agreements in commercial contracts "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Id. (quoting 9 U.S.C. § 2).   Thus, so long as a federal court is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue," the court must order parties to arbitrate any claims subject to the agreement.  9 U.S.C. § 4.

This doctrinal rule reaffirms federal courts' authority to determine the existence and validity of an arbitration agreement.  Farnsworth v. Towboat Nantucket Sound, Inc., 790 F.3d 90, 96 (1st Cir. 2015).  But it also limits the scope of potential challenges to arbitration clauses.  Id.  Because a mutual promise to arbitrate constitutes effective consideration, an arbitration agreement can be severed from an otherwise ineffectual contract. Rent-A-Center, 561 U.S. at 70-71.  This means in part that a party seeking to avoid arbitration usually must show that the arbitration clause itself is invalid.  Id.  A challenge to "another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate."  Id. That said, a party may still challenge the contract's formation. If an "agreement between [the parties] was [not] concluded," neither was an arbitration agreement within that contract.  Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 444 n.1 (2006).

Under this framework, a court has a somewhat straightforward task when presented with a "delegation clause" -- an agreement to submit to arbitration those issues relating to the scope, validity, and enforceability of an arbitration agreement. First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 942 (1995). The FAA treats these clauses like any other arbitration agreement. Bossé v. N.Y. Life Ins. Co., 992 F.3d 20, 27 n.7 (1st Cir. 2021). Thus, whenever parties form a valid and enforceable delegation agreement, the FAA compels courts to send the entire action to arbitration. Id. at 27 ("[W]here the parties 'by clear and unmistakable evidence' delegate issues of arbitrability to the arbitrator, 'the courts must respect the parties' decision as embodied in the contract' and send the issue to the arbitrator to decide." (quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 65, 69 (2019))); see also Coinbase, Inc. v. Suski, 602 U.S. ___, 144 S. Ct. 1186, 1194 (2024) ("In cases where parties have agreed to only one contract, and that contract contains an arbitration clause with a delegation provision, then, absent a successful challenge to the delegation provision, courts must send all arbitrability disputes to arbitration."). The party opposing arbitration can then only

challenge the formation of the contract or the specific validity of the delegation provision.[3] Rent-A-Center, 561 U.S. at 71.

Toth lodges both formation and validity challenges. She contends that she and Everlywell never formed a contract and, by extension, never formed an agreement to arbitrate. Alternatively, she argues that the unilateral-modification clauses render any contract illusory and that various terms in the User Agreement render the arbitration agreement unconscionable.

"In reviewing the district court's resolution of a motion to compel arbitration, we review legal issues de novo and factual determinations for clear error." Canales v. CK Sales Co., 67 F.4th 38, 43 (1st Cir. 2023) (citing Fraga v. Premium Retail Servs., Inc., 61 F.4th 228, 233 (1st Cir. 2023); and Cullinane v. Uber Techs., Inc., 893 F.3d 53, 60 (1st Cir. 2018)).[4]

---

[3]    The parties agree that the contractual questions are governed by Massachusetts law.

[4]    Toth asks us to apply instead a summary-judgment standard, remanding if we find any disputed material facts. Although we "normally . . . accept the district court's findings of fact subject only to clear error review[,]" Toth correctly identifies that when the district court makes no factual findings, we "accept only those facts that are effectively undisputed, and otherwise identify those factual disputes that need be resolved, much as if we were ruling on a grant of summary judgment." Fraga, 61 F.4th at 233. Here, the district court made a finding on the only disputed fact -- whether Toth could return her test. Thus, the summary-judgment standard is inapplicable. And even if it did apply here, Toth's proposed standard would not affect the outcome of her appeal because, as we explain in Part II.A.2., whether Toth could return the test is immaterial.

**A.**

We turn first to formation.  To determine whether parties have formed a contract, Massachusetts courts apply a reasonableness test, "focusing on whether the contract provisions at issue 'were reasonably communicated and accepted.'"  Kauders v. Uber Techs., Inc., 159 N.E.3d 1033, 1048-49 (Mass. 2021) (quoting Ajemian v. Yahoo!, Inc, 987 N.E.2d 604, 611 (Mass. App. Ct. 2013)).  That is, the party against whom the contract is being enforced must have (1) received "reasonable notice of the terms" and (2) "reasonabl[y] manifest[ed] . . . assent to those terms."  Id.

Applying this test, Massachusetts courts "regularly enforce[]" so-called "clickwrap" contracts.  Id. at 1049.  A clickwrap contract is an online agreement that requires a user to affirmatively accept its terms by clicking a checkbox but does not require the user to view or scroll through those terms.  Cullinane, 893 F.3d at 61 n. 10.  Courts distinguish clickwrap contracts from "browsewrap" contracts, in which "the online host dictates that assent is given merely by using the site[;]" "scrollwrap" contracts, in which "users . . . physically scroll through an internet agreement and click on a separate 'I agree' button in order to assent to the terms and conditions of the host website[;]" and "sign-in-wrap" contracts, in which "assent to the terms of a website" is "couple[d] . . . with signing up for use of the site's

services[.]" Id. (quoting Berkson v. Gogo LLC, 97 F.Supp. 3d 359, 394-95 (E.D.N.Y. 2015)).

Due to their similarity to traditional written contracts, clickwrap contracts usually create equivalent contractual obligations. 1 Corbin on Contracts § 2.12 (2023) ("From a contract law perspective, there is little controversy surrounding clickwrap agreements. They are generally akin to signing a traditional pen and ink contract."). And the reasonableness test reflects this. Requiring users to signal their agreement by clicking a checkbox "puts the user on notice that the user is entering into a contractual arrangement," satisfying the notice prong, and "[r]equir[es] an expressly affirmative action," satisfying the assent prong. Kauders, 159 N.E.3d at 1050-51; see also Bekele v. Lyft, Inc., 199 F.Supp. 3d 284, 295-296 (D. Mass. 2016), aff'd, 918 F.3d 181 (2019) ("Massachusetts courts have routinely concluded that clickwrap agreements -- whether they contain arbitration provisions or other contractual terms -- provide users with reasonable communication of an agreement's terms.").

Everlywell presented its arbitration clauses to Toth as a part of a clickwrap contract. To register her food-sensitivity test, Toth had to "click 'I agree,' but [did] not necessarily [have to] view the contract to which she [was] assenting." Cullinane, 893 F.3d at 61 n. 10 (quoting Berkson, 97 F. Supp. 3d at 394-402).

And like most clickwrap contracts, the User Agreement, including the arbitration agreement within, is a validly formed contract under Massachusetts law.

### 1.

First, the account-creation page gave Toth proper notice of the contract.  The language next to the checkbox indicates that users must read and accept the terms and conditions, signifying to users that they are entering into a contractual arrangement, and the terms themselves are linked.  Although Toth maintains that she did not read the User Agreement, "[i]n Massachusetts courts, it has long been the rule that '[t]ypically, one who signs a written agreement is bound by its terms whether [s]he reads and understands them or not[,]'" especially when the offeror provides inquiry notice.  Awuah v. Coverall N. Am., Inc., 703 F.3d 36, 44 (1st Cir. 2012) (second alteration in original) (quoting St. Fleur v. WPI Cable Sys./Mutron, 879 N.E.2d 27, 35 (Mass. 2008)); see also Good v. Uber Techs., Inc., SJC-13490, slip op. at 34-35 (Mass. June 7, 2024) ("We do not require, for purposes of reasonable notice, that the user actually scroll through the terms.").  And we have previously acknowledged that "requiring users to click a box stating that they agree to a set of terms, often provided by hyperlink, before continuing to the next screen" is "a common method of conspicuously informing users of the existence and location of terms and conditions[.]"  Cullinane, 893 F.3d at 62;

see also 15 Corbin on Contracts § 83.5 (2023) ("The overriding authorities suggest that clicking a box indicating that 'I have read and agreed to [the] User Agreement & Terms of Service' is enough to put a reasonable user on notice that there were contractual terms applicable to the usage of the site.").

Toth maintains that a "fact-intensive inquiry" into the circumstances reveals that the website does not provide proper notice. She relies on Kauders, a Supreme Judicial Court of Massachusetts ("SJC") opinion which, in her view, establishes that customers signing up for online services should not reasonably expect to subject themselves to "extensive terms and conditions," such as an arbitration provision. 159 N.E.3d at 1051. Kauders, however, does not sweep so broadly. The SJC did not conclude that an online-service contract could never notify a customer of an arbitration provision. It merely clarified that the unique nature of online-service contracts requires courts to "carefully consider the interface and whether it reasonably focused the user on the terms and conditions." Id. at 1051-52. The user-registration page in that case, the court held, did not sufficiently focus its users on the terms and conditions that it was attempting to enforce. Id. at 1054.

The same is not true of Everlywell's account-creation page. The Kauders court specifically distinguished the browsewrap contract at issue from clickwrap contracts, recognizing that the

- 16 -

latter "alert users to the significance of their actions." Id. at
1051.   Further, Everlywell's terms and conditions are far more
conspicuous  than  those  in  the  putative  contract  at  issue  in
Kauders.   On the user-registration pages in that case, the link to
the terms and conditions appeared on a separate payment screen,
not a general account-creation screen; "other terms on the same
screen" had "a similar or larger size, typeface, and . . . more
noticeable attributes[;]" and a user could have reasonably clicked
through the payment screen without scrolling down to the terms and
conditions.   Id. at 1053-54 (quoting Cullinane, 893 F.3d at 63).
On  Everlywell's  account-creation  page,  by  contrast,  the  linked
terms  and  conditions  are  bolded  in  green,  directly  above  the
"Create My Account" button, and next to a checkbox that users must
click before creating an account.

          Toth  also  contends  that  Everlywell's  account-creation
page  does  not  reasonably  convey  the  nature  of  the  contract.   Even
if Everlywell's website does notify users that they are entering
into  a  contract,  she  argues,  a  reasonable  consumer  would  infer
that the contract "relate[s] only to terms for using an account on
Everlywell's site[,]" not terms for using a test kit.

          Toth  cites  only  one  case  holding  that  a  clickwrap
contract  did  not  sufficiently  notify  users  of  an  arbitration
clause's scope, Applebaum v. Lyft, Inc., 263 F. Supp. 3d 454
(S.D.N.Y. 2017), which has little import here.   Applebaum applied

New York law to invalidate a clickwrap contract that was hyperlinked, in very small font, on a page titled "Add Phone Number."[5]  Id. at 467.  Reasonable users, the court concluded, would assume that the terms and conditions related only to Lyft's use of their phone numbers.  Id.  The User Agreement here is not so misleading.  It appears on the "Account Creation" page, which users must access to receive their results, and Toth fails to explain why, notwithstanding that distinction, Applebaum would dictate the result here.  A reasonable user would understand that the terms and conditions on Everlywell's site applied to use of the test kit.

**2.**

Second, Everlywell secured meaningful assent from Toth when it required her to click the checkbox before creating her account.  As the SJC has reiterated, clickwrap contracts are the "clearest manifestations of assent" because they require users to affirmatively signal their acceptance of the attached terms.  Kauders, 159 N.E.3d at 1050; see also Hughes v. McMenamon, 204 F. Supp. 2d 178, 181 (D. Mass. 2002) (collecting cases).  And Toth

---

[5]    It is unclear whether Massachusetts courts impose as rigorous a notice requirement as New York courts.  See Wickberg v. Lyft, Inc., 356 F. Supp. 3d 179, 183 n.2 (D. Mass. 2018) (finding the notice analysis in Applebaum "unpersuasive, as [it] appl[ies] New York . . . law, and not the law of Massachusetts").

admits that she clicked the checkbox affirming that she read and accepted the User Agreement.

Toth nevertheless maintains that she did not meaningfully assent to the contract. In her view, "consumers had no ability to reject Everlywell's contracts" because they could not always return the test kits after purchase. She contends that she was forced to decide between assenting to the User Agreement or forfeiting the benefit of the test she had already paid for.[6] But this supposition relies on the premise that Everlywell had a pre-existing obligation to provide Toth the benefit of the test, and Toth does not defend that premise in any developed way. Toth purchased the test from Target, not Everlywell. The only source Toth points to for Everlywell's purported obligation to her is Everlywell's "express warranty" that it would provide results to customers who purchased the test. But, as Everlywell points out, the box containing the test Toth purchased stated on its exterior that "[p]urchase, registration, and use are subject to agreeing to the Everlywell User Agreement, which can be read at

---

[6] Toth also frames this arrangement as lacking new consideration, because the only consideration that Everlywell purported to give in exchange for Toth's promise to arbitrate is a set of services it was already obligated to provide. But the User Agreement contained "bilateral obligations that independently constitute valid consideration[,]" Solo-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 475 (1st Cir. 2011), including Everlywell's mutual promise to arbitrate. Toth's only response, which boils down to questioning the adequacy of the consideration, is unsupported by any authority.

everlywell.com/terms[.]"  And while the parties dispute whether that disclaimer was shown on Target's website, even if we assume that it was not, Toth never explains why that omission on Target's part would result in Everlywell having an obligation to Toth based on having made an express warranty.  Thus, Toth has failed to show that Everlywell owed a pre-existing obligation to her and thereby failed to show that Everlywell coerced her assent by threatening non-performance.

Toth also charges Everlywell with failing to make clear through its contracts that users can reject the User Agreement and receive a refund.  "[A]ny purported assent is meaningless[,]" Toth claims, if users do not know that they can receive a refund.  This principle derives from the theory of "rolling" contracts: sales contracts with terms that the seller conveys to the buyer after the sale.  See DeFontes v. Dell, Inc., 984 A.2d 1061, 1071 (R.I. 2009); ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1452 (7th Cir. 1996).  The jurisdictions that recognize these contracts hold the customer to the post-sale terms when the customer has "a right to return the [product] if the terms are unacceptable."[7]  ProCD, 86 F.3d at 1451.

_____

[7]    Many states do not adopt a rolling-contract theory.  See 15 Corbin on Contracts § 83.5 (2023) ("[T]he 'money now, terms later' line of cases, or the 'rolling contract' theory, upsets the usual chronology of contract formation and is controversial."); Howard v. Ferrellgas Partners, L.P., 748 F.3d 975, 982 (10th Cir. 2014).

Even if we assume, albeit without deciding, that Massachusetts recognizes rolling contracts,[8] we discern no reason to hold clickwrap contracts to a similar standard. The right to return plays an essential role in a customer's assent to a rolling contract. When a retailer notifies its customers of their right to reject post-sale terms by returning a product, and a customer continues to use that product after purchase, a court can assume that the customer accepted the terms. See id. at 1452-53; DeFontes, 984 A.2d at 1068. Clickwrap contracts, on the other hand, provide much stronger evidence of the customer's assent -- that the customer affirmatively clicked on the checkbox. Thus, a court need not determine whether the customer's use of the product signaled assent to the post-sale terms.

Had Toth sued Everlywell before creating an account, her case would present an intriguing assent question: Did Toth effectively accept the User Agreement by buying and using the test without attempting to return it? Instead, her case presents a much more straightforward question, easily answered by Toth's admission that she clicked the checkbox.

---

[8]    The cases cited by the parties reveal little on this score. Compare Feeney v. Dell Inc., 34 N.E.3d 780 (Mass. App. Ct. 2015) (unpublished) (enforcing a money-now-terms-later contract); with Casavant v. Norwegian Cruise Line, Ltd., 829 N.E.2d 1171, 1175 (Mass. App. Ct. 2001) (refusing to enforce additional terms after sale).

**B.**

Having determined that Toth and Everlywell formed a contract through the User Agreement, we turn next to the validity of the arbitration agreement contained within that contract. Recall that the FAA requires Toth to "challenge[] . . . the validity of the specific agreement to resolve the dispute through arbitration" and not merely "the validity of an entire contract which contains an arbitration clause[.]" Farnsworth, 790 F.3d at 96 (emphasis added). Our first step, then, is to analyze the scope of the parties' agreement to arbitrate.

We concur with the district court's conclusion that the parties agreed to arbitrate issues of arbitrability, including the validity and scope of the arbitration agreement. The User Agreement states that disputes shall be resolved "in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the 'AAA')[.]" And other cases are "clear that incorporation of the AAA arbitration rules constitutes clear and unmistakable evidence of the parties' intent to delegate arbitrability issues to the arbitrator." Bossé, 992 F.3d at 29. Indeed, the AAA rules provide that the arbitrator must hear any "objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." Com. Arb. Rules & Mediation Procs. R-7(a) (2013). A court can therefore consider validity challenges such as Toth's

only insofar as they apply to the delegation provision -- the provision incorporating the AAA arbitration rules.[9] See Bossé, 992 F.3d at 27-28.

### 1.

Toth first argues that the unilateral-modification clauses render the User Agreement an illusory contract. Her argument, however, is foreclosed by our decision in Emmanuel v. Handy Technologies, Inc., 992 F.3d 1, 10-11 (1st Cir. 2021). There, a house cleaner claimed that a unilateral-modification clause contained in her employment contract rendered an arbitration clause within that contract unconscionable. Id. at 3-4, 10-11. We were not persuaded, holding that, "as a matter of substantive federal arbitration law," the unconscionability challenge "must be considered by the arbitrator in the first instance." Id. at 11 (internal quotations omitted). The employer, we reasoned, did not use the modification clause to revise the arbitration provision, and the house cleaner did not "contend that

---

[9]    Toth claims that Everlywell waived any argument that the User Agreement delegates validity challenges. According to her, in its motion to compel arbitration, "the only issue Everlywell contended was delegated to the arbitrator was the scope of the arbitration clause -- not its validity." Everlywell's alleged waiver is of no moment, though, because the arbitration agreement "clear[ly] and unmistakabl[y]" delegates issues of validity to the arbitrator by incorporating the AAA rules. Bossé, 992 F.3d at 29. And we are "at liberty to affirm a district court's judgment on any ground made manifest by the record, whether or not that particular ground was raised below." United States v. George, 886 F.3d 31, 49 (1st Cir. 2018).

the unconscionability of the modification clause so infects the Agreement that severing that clause would effectively rewrite the bargained-for exchange as to arbitration." Id.

Toth falls prey to the same trap. Not only is it unclear whether the unilateral-modification provisions even apply to the arbitration clause, but Toth also does not assert that Everlywell modified the arbitration clause, nor that the modification clauses would "rewrite the bargained-for exchange[.]" Id. Thus, regardless of the merits of her illusoriness challenge to the User Agreement as a whole, it is a subject for an arbitrator and not a court.

**2.**

Second and finally, Toth contends that the arbitration agreement is unconscionable and therefore unenforceable against her. Massachusetts courts apply a "lower threshold for finding unconscionability" to contracts of adhesion, such as clickwrap contracts. Good, SJC-13490, slip op. at 47 n.41. However, under Massachusetts law, a contract is unconscionable if, and only if, it is both substantively and procedurally unconscionable. Machado v. System4 LLC, 28 N.E.3d 401, 414 (Mass. 2015); Bekele v. Lyft, Inc., 918 F.3d 181, 187-88 (1st Cir. 2019). And Toth fails to meet Massachusetts's lower standard because she has not shown that the delegation provision itself is substantively unconscionable.

Toth flags a litany of provisions in the User Agreement that she claims renders the arbitration provisions substantively unconscionable.  She argues that because the damages limitation caps her recovery to the test's price, but arbitration would cost her at least $1,700, she will always lose money in arbitration. Toth also explains that the shortened statute of limitations, the scope provision (which she claims sends to arbitration only claims that a customer would likely bring), and the forum-selection clause collectively create an arbitration process that favors Everlywell.

The Supreme Court considered a similar challenge in Rent-A-Center.  Despite having signed an arbitration agreement with his employer, the plaintiff-employee there sought to keep his employment-discrimination suit in federal court by arguing that the agreement was unconscionable.  561 U.S. at 66.  The arbitration agreement was substantively unconscionable, he contended, because it applied only to claims that an employee would bring, contained a fee-splitting arrangement, and limited his ability to conduct discovery.  Id. at 73-74.  The Court disagreed, explaining that the plaintiff-employee "did not make any arguments specific to the delegation provision;" rather, he argued that these aspects of the arbitration agreement "rendered the entire Agreement invalid." Id. at 74 (emphasis in original).  Thus, the Court concluded that the arbitration panel must decide whether the rest of the arbitration agreement was unconscionable.

So too here.  Toth identifies many allegedly one-sided provisions in the dispute-resolution section of the User Agreement, but none make the delegation provision itself unfair or somehow restrict Toth's ability to challenge the validity of the arbitration agreement before an arbitrator.  Toth does target the AAA clause insofar as its cost-sharing rules, along with Everlywell's damages limitation, ensure that she loses money.  But this damages limitation affects Toth's eventual recovery; it does not affect Toth's ability to challenge (in arbitration, pursuant to the delegation provision) the validity of the parties' agreement to arbitrate the merits of her dispute.  See id. (rejecting the same argument).  The same is true of the clauses shortening the statute of limitations and dictating which claims are subject to arbitration.

Only one provision cited by Toth affects the parties' ability to adjudicate arbitrability issues: the forum-selection clause requiring Toth to arbitrate the validity of the arbitration clause in Texas, Everlywell's home state.  Yet, she does not explain how litigating in Texas oppresses her.  See Bekele, 918 F.3d at 188 (1st Cir. 2019) (defining substantive unconscionability as "terms [that] are oppressive to one party").  Thus, Toth has not demonstrated that the agreement to arbitrate is invalid.

**III.**

For the foregoing reasons, we **affirm**.